# UNITED STATES of America, Appellee,

v.

# Carlton A. REID, Appellant.

## No. 91–3304.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1993.

Decided July 23, 1993.

Allen E. Burns, Asst. Federal Public Defender, with whom A.J. Kramer, Federal Public Defender, and James R. Holloway, Asst. Federal Public Defender, Washington, DC, were on the brief for appellant.

Stephen P. Anthony, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, Thomas C. Black, and Robert J. Meyer, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before: MIKVA, Chief Judge; WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Dissenting opinion filed by Circuit Judge WALD.

MIKVA, Chief Judge:

This troubling case requires the court to examine the bounds of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its considerable progeny. *Terry* allowed the police to "frisk" a suspect for weapons when they stopped someone and had reason to believe that they were dealing with a possibly armed person. While *Terry* only analyzed the "frisk," it implicitly assumed the validity of the stop itself when there was a similar reasonable belief that a crime had been or was being committed. This implicit authority to stop a suspect without a warrant under *Terry* was made explicit in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). We uphold the "stop and frisk" in this case.

As might be expected, all of the cases which involve this "stop and frisk" exception to the warrant requirements of the Fourth Amendment turn on the specific facts of the case. Sometimes the line between when police conduct will be upheld and when it will be rejected is very thin; it always depends on the precise factual situation that confronted the officer of the case. This case presents a particularly close call, and therefore the facts must be detailed at some length.

On March 29, 1991, at approximately 11:40 a.m., several officers of the Metropolitan Police Department were moving quickly up a short flight of steps in a small apartment complex to execute a search warrant for narcotics. The warrant authorized a search for narcotics, notebooks, binders and personal papers proving residency within the apartment. As the officers came up the stairs, holding their weapons at the ready, they saw the defendant, Carlton Reid, exit the apartment to be searched and proceed down the stairs. The first two officers on the steps allowed Reid to pass them by; the third officer, Carter, ordered Reid to stop, and immediately conducted a pat-down for weapons. Reid did not say anything to Carter, nor did he resist the stop and frisk. Officer Carter did not find a weapon, but did find and retrieve from Reid's front shirt pocket a large plastic bag. The bag contained 23 ziplock bags of crack cocaine, several empty ziplock bags, and one ziplock bag which contained a razor blade.

Officer Carter returned the large plastic bag to Reid's shirt pocket and detained Reid while the other officers broke down the door to the apartment and executed the search warrant. After the officers entered the apartment, Reid was taken inside, placed on the floor and again patted down. The officers again retrieved the large plastic bag from Reid's shirt pocket, and also discovered two much larger pieces of crack cocaine in Reid's pants pocket. Reid was then arrested for possession of crack cocaine.

Reid sought to have the evidence suppressed prior to trial, and, at the suppression hearing, additional pertinent facts were

brought forth. Officer Carter testified that his reason for believing that Reid should be stopped stemmed from his leaving of the apartment just as it was about to be searched for drugs. Officer Carter explained that he searched Reid for weapons "[b]ecause in my experience as a police officer in executing narcotics search warrants, it's always a chance that sometime there is weapons in the premises or on persons in that premises." When Officer Carter patted Reid's chest, he felt a "hard object" that "could have been a gun." He further testified that the first two officers who preceded him up the steps had specific functions in the prospective search: the first officer was carrying the ram, with which the door to the apartment was in fact knocked down; the second officer was the "announce" officer who informed the residents of the apartment that the police had a warrant and were entitled to entry.

The trial court denied the motion to suppress the evidence that was seized from Reid. Judge Richey concluded that the police had a reasonable basis for the stop: "under the totality of the circumstances here, the conduct of the police was reasonable...." The trial court found that the officers in this case "had even more reason to be careful" because the warrant for the apartment to be searched described it as a place where "crack activity was being conducted."

The legal landscape reflects all of the variations on the theme first articulated by the Supreme Court in *Terry*. The tension between the promises of personal security in the Fourth Amendment to the Constitution and the need for police to be able to protect themselves from concealed weapons every time a suspect is stopped is real and ongoing. The conflict between the right to be let alone and the need for the police to be able to pursue enforcement and investigative tasks is equally sharp. In all of these contraplexes, the Supreme Court has made it clear that the Fourth Amendment protection from unlawful search and seizure is not an impenetrable barrier to the police performing their necessary tasks and protecting themselves from concealed weapons in such performance. As Chief Justice Warren stated in *Terry*,

the central inquiry under the Fourth Amendment [is the] reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.... The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

*Terry*, 392 U.S. at 19, 21–22, 88 S.Ct. at 1878, 1880 (citations and footnotes omitted). With that as the touchstone, we cannot say that the conduct of Officer Carter was unreasonable in the circumstances of this case. We have no basis for resolving the ambivalence any differently than did Judge Richey, who heard first-hand the accounting of the situation that prevailed on the day of the drug raid.

Counsel for Reid argue that cases such as *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) call for a reversal in this case. In *Ybarra*, the Supreme Court refused to uphold a search and seizure of patrons in a public tavern that was being searched lawfully pursuant to a warrant. The Court explained that the frisk of Ybarra was unjustified because the police knew nothing about Ybarra "except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* at 91, 100 S.Ct. at 342. The frisk in this case, however, did not occur in a public place. Common sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual who happens to be in a public tavern where the bartender is suspected of possess-

ing drugs. Police officers are not blind to these realities and we should not encourage them to be.

The government, for its part, urges us to align this case with *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). In *Summers,* the Supreme Court held that it was appropriate to detain a person who was in the process of leaving his apartment when the officers arrived to execute a search warrant of his house. Notably, the Court did not consider whether the search of Summers was justified because the frisk occurred after probable cause to arrest had been established. Moreover, unlike Summers, Reid was *not* a resident of the apartment which was to be searched under the warrant, and the trial did not disclose that he had any proprietary or residential interest in the suspect premises. In that respect, Reid is closer to the patron in the bar than the owner of the *Summers* house. That distinction, however, also points up the futility of trying to fashion a bright line rule that will tell judges which searches and seizures are which side of *Terry.* It is more important to remember Chief Justice Warren's admonition that the "scheme of the Fourth Amendment" is bottomed on the "reasonableness of a particular search or seizure in light of the particular circumstances." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. It does not stretch the imagination too much to conjure up a fact situation where a bar patron might be a reasonable target for a "stop and frisk" notwithstanding the *Ybarra* precedent, any more than that it might be unreasonable under some circumstances to detain a homeowner whose house is about to be searched.

The government would like us to extend *Summers* to hold that the police, when executing a narcotics search warrant, should be able to search everyone on the premises for weapons. *People v. Thurman,* 209 Cal. App.3d 817, 257 Cal.Rptr. 517 (1989), seems to support that view. Whatever the intrinsic logic of that intermediate court case in California, it does not fit the facts of this case any more than *Summers.* Reid was not *on or in* the premises to be searched, and were it not for the specific testimony of Officer Carter that he felt endangered by Reid's potential presence behind the police officers as they were seeking to execute the search warrant, the government could not prevail. Difficult as it may be to fashion appellate review on such fact-bound principles, it seems necessary to do so when the challenge to support liberty *and* order is as great as it is under the Fourth Amendment.

We recognize the danger of slippage into a guilt by association pattern whereby anyone seen near prospective drug activity becomes fair game for a stop and frisk. *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) was just such a case. The police officer was told in no uncertain terms that "[t]he inference that people who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." *Sibron,* 392 U.S. at 62, 88 S.Ct. at 1902. The line of distinction is admittedly thin between people who talk to narcotics addicts and people who frequent apartments where narcotics activity is being conducted. But it is a line that has some bearing on the reasonableness of the officer's conduct. There is more reason to suspect that an individual who is present in a private residence containing drugs is involved in illegal drug activity than someone who merely holds conversations with drug addicts in public places. Here, the justification for the stop and frisk lies in Reid's proximity to the premises to be searched, and the reasonableness of Officer Carter's expressed concern about his safety and that of his colleagues. We have even less basis for challenging that reasonableness on appeal than did the trial court in hearing the evidence on the motion to suppress evidence.

We recognize that we have created no beacons for police or trial judges to use in navigating the deep waters of Fourth Amendment doctrine. Unfortunately, "reasonableness" is not a plain meaning word that lends itself to bright-line parsing.

\* \* \*

Reid also contends that the district court committed reversible error by refusing to grant him a two-level reduction in his base

offense level for acceptance of responsibility. *See* U.S.S.G. § 3E1.1(a) (a sentence reduction is warranted "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for [his] criminal conduct"). According to Reid, he is deserving of the two-level reduction because he accepted responsibility for his offense during his testimony at the suppression hearing and went to trial only to preserve his Fourth Amendment claims for appeal.

The district court was not persuaded that Reid's testimony at the suppression hearing amounted to an unequivocal acceptance of responsibility. Rather, the court found Reid's testimony to be somewhat contradictory and ambiguous. In addition, the court found Reid's refusal to discuss the facts of the case with his probation officer to be inconsistent with his claim of acceptance of responsibility.

 As we explained in *United States v. Barry*, acceptance of responsibility determinations by the district court are "entitled, *at the least*, to the benefit of the clearly erroneous standard of review." *United States v. Barry*, 961 F.2d 260, 266 (D.C.Cir.1992) (quoting *United States v. Taylor*, 937 F.2d 676, 680 (D.C.Cir.1991) (emphasis added by *Barry* Court). Viewing the district court's decision under this highly deferential standard, we see no basis for reversal. Not only was the sentencing court "unquestionably in a better position to assess the contrition and candor" of the defendant than we are on appeal, *Taylor*, 937 F.2d at 680, the defendant in this case pled not guilty and went to trial.

 A two-point reduction for acceptance of responsibility is generally not available to a defendant that has put the government to its proof. *See* U.S.S.G. § 3E1.1; *United States v. McLean*, 951 F.2d 1300, 1303 n. 2 (D.C.Cir.1991). And while Reid apparently went to trial to "preserve issues that do not relate to factual guilt," we are not persuaded that this is necessarily one of those "rare

situations," where the defendant is entitled to a two-point reduction even though he put the government to its proof. *See* U.S.S.G. § 3E1.1 comment n. 2. It was reasonable for the district court to conclude that Reid's failure to discuss the case with his probation officer, taken together with his ambiguous testimony during the suppression hearing and his decision to go to trial, failed to make out the clear showing necessary to justify a two-point reduction for acceptance of responsibility. Reid's conviction and sentence are therefore affirmed.

*Affirmed.*

WALD, Circuit Judge, dissenting:

It is well settled that an officer may not stop and search a person for weapons absent a reasonable belief, supported by "specific and articulable facts," that "the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Terry v. Ohio*, 392 U.S. 1, 21, 24, 88 S.Ct. 1868, 1880, 1881, 20 L.Ed.2d 889 (1968). Significantly, the record in this case provides no basis for a reasonable belief that Reid was "armed and dangerous." Moreover, it provides only the most attenuated basis—his proximity to or possible emergence from the apartment to be searched—for believing that he had any connection at all with suspected criminal activity. Accordingly, I dissent from the majority's affirmance of the denial of the motion to suppress.

The Supreme Court has "invariably held" that a "reasonable belief that [a person] [i]s armed and presently dangerous ... must form the predicate to a patdown of a person for weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979); *see also Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (officer may conduct weapons search only if she is entitled to make a forcible stop and has reason to believe the suspect is armed and dangerous).[1] To justify a pat-

---

1. The district court concluded that the officers "had a legitimate, if not a safety, reason for doing what they did." Since this stop and frisk cannot be justified as a search for evidence or a search incident to arrest, the officers' safety seems to be the only legitimate reason remaining. *See Terry*, 392 U.S. at 29, 88 S.Ct. at 1884 ("The sole justification of the search [under *Terry*] ... is the protection of the police officers and others nearby....").

down, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880; *Brown v. Texas*, 443 U.S. 47, 51–52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) (stop and frisk not justified where officer testified that person was "looking suspicious," but could not point to "specific, objective facts" supporting that conclusion). Such facts are absent in this case.

Officer Carter, the one who actually stopped and frisked Reid, did not have any information indicating that Reid was carrying a weapon. *Cf. United States v. Clipper*, 973 F.2d 944, 950 (D.C.Cir.1992) (finding reasonable suspicion for a *Terry* stop where officers were informed that person was carrying a gun, and distinguishing a gun tip from a drug tip because of the "unique dangers" of firearms), *cert. denied*, —— U.S. ——, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993). He saw nothing in Reid's hands, nor did he see Reid reach into his pocket. The search warrant did not indicate any probable cause to believe there were weapons in the apartment; it authorized only the search for drugs and for personal papers, such as residency papers. *Cf. United States v. Harvey*, 897 F.2d 1300, 1304 (5th Cir.) (upholding stop and frisk of person approaching house that was well-known as site for gun deals and in which guns had just been seized), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 568, 112 L.Ed.2d 574 (1990); *United States v. Clay*, 640 F.2d 157 (8th Cir.1981) (even where officers had already seized arms in a residence, there was no reason to search person who approached the residence, then hesitated and stepped back upon seeing the officers).

Nor do the other circumstances surrounding this stop and frisk support the reasonable belief that the officers were at risk from Reid as they went about their business of executing the search warrant.

Factors that may justify an investigative stop, a search for weapons, or the escalated use of force include the time of day, the "high-crime" nature of the area, an informant's tips that person might be armed, furtive hand movements, flight or attempted flight by the person sought to be detained, and a pressing need for immediate action.

*United States v. Laing*, 889 F.2d 281, 286 (D.C.Cir.1989) (citations omitted), *cert. denied sub nom. Martin v. United States*, 494 U.S. 1008, 110 S.Ct. 1306, 108 L.Ed.2d 482 (1990). The court found no evidence that Mr. Reid was attempting to flee. There was no testimony that he made furtive movements, resisted arrest, or did anything other than instantly and quietly comply with the officers' commands. Moreover, there were at least a half dozen officers, weapons drawn, entering this apartment building at midday. *Cf. Adams v. Williams*, 407 U.S. at 146–48, 92 S.Ct. at 1923–24 (stop and frisk reasonable where officer alone at night in high-crime area acting on a tip from known informant that person was carrying drugs and a gun and the suspect did not comply with officer's request); *Laing*, 889 F.2d at 286 (reasonable to search person who shoves his hands into his pockets and attempts to flee when found in dead of night outside apartment that is believed to contain automatic weapons and is located in a high-crime area). Finally, Reid was in the building's public space, not inside the apartment to be searched,[2] so there was not, as the govern-

---

**2.** While I agree with the majority that there may be distinctions between searching someone "found in a small private residence containing drugs," Majority opinion ("Maj. op.") at 1578, and someone in the public tavern at issue in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), I find that the common areas in an apartment building or complex—hallways, laundry rooms, lobbies—fall somewhere between the two. The stairwell in which the officer encountered Reid may not be as public as a tavern, but it appears that it was open to any member of the public who chose to walk in,

from a police officer to a Girl Scout selling cookies. Under these circumstances, a person's presence in the hallway, unlike her presence in a "small private residence containing drugs," would not necessarily suggest any involvement, much less an illegal involvement, with the occupants of a specific apartment. Besides, even in a private residence, a person's mere presence is less suggestive than her proximity to openly-displayed drugs. *See United States v. Pace*, 898 F.2d 1218, 1240 (7th Cir.), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990) (fact that persons were inside another's home with money and drugs out in the open suggested

ment urged, "a compelling need to search for weapons, since (unlike a street encounter) the officers may be in close proximity to the individual for a period of time, with their attention directed to the premises, rather than to the individual." *Cf. Maryland v. Buie,* 494 U.S. 325, 333, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990) (noting that in an arrest in a home officers face dangers of "an ambush in a confined setting of unknown configuration").

Additionally, the search warrant did not name or describe any individuals, and Carter testified that he did not know who Reid was and did not have any information, other than his presence in the building, connecting him to the apartment to be searched or to the suspected drug activity. Indeed, the only reason Officer Carter offered for searching Reid was his experience that "in executing narcotics search warrants, it's always a chance that sometime there is weapons in the premises or on persons in that premises." Reid, of course, was not "in the premises" to be searched. Instead, Officer Carter testified that he encountered and stopped Reid on the stairs that descended from the landing in front of the apartment to be searched. Granted, Carter also testified that he saw Reid leaving that apartment. But even assuming that the district judge credited this testimony, which, as discussed below, is unclear, this alone does not give rise to a reasonable belief that Reid was "armed and dangerous." At most it meant that he associated in some capacity—as a neighbor, friend, door-to-door salesperson, spiritual counselor, or whatever—with persons suspected of having drugs in their apartment. It certainly does not create a reasonable belief that he was a "substantial dealer in narcotics," who could be expected to own firearms. *See United States v. Payne,* 805 F.2d 1062, 1065 (D.C.Cir.1986) (per curiam).

It is beyond dispute that mere association with persons suspected of criminal activity does not justify a protective search. In *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court

held that a person's conversations with ten or so known narcotics addicts on the street and in a restaurant over an eight-hour period did not give a police officer reason to seize him in the restaurant and search him. *See also Ybarra,* 444 U.S. at 91, 100 S.Ct. at 342 ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.") (citing *Sibron,* 392 U.S. at 62–63, 88 S.Ct. at 1902–03). Indeed, the majority itself recognizes the danger of slipping into "a guilt by association pattern" of frisking "anyone seen near prospective drug activity." Maj. op. at 1578–79. I do not believe that this danger is averted by the majority's admittedly "thin" distinction between "people who talk to narcotics addicts and people who frequent apartments where narcotics activity is being conducted," Maj. op. at 1578–79, especially since, in this case, the officer had no information that Reid "frequented" the apartment and there was merely a suspicion that narcotics activity was going on inside. This is not a case in which the drug activity is conducted directly under someone's nose, *see, e.g., Holder,* 990 F.2d at 1329 (upholding arrest and search of person found five feet from drugs in plain view), supporting the belief that he was aware of or involved in the activity. Instead, an unidentified person leaving the apartment may well have watched television in the living room or repaired a pipe in the kitchen, blissfully unaware that drugs were stashed in a bedroom closet or hidden in a nightstand drawer. Besides, even if the officer could infer that, because Reid had been in the apartment, he was aware of any drug activity conducted there, that does not justify the belief that he was "presently armed and dangerous." Accordingly, I cannot conclude under these circumstances that Reid's emergence from or proximity to the apartment, without more, justified a weapons search.

The district court's stated basis for the ruling below casts even greater doubt on the reasonableness of the search. Although Car-

---

that occupant trusted them and that they were involved in his drug operation, thus providing probable cause to arrest them); *United States v. Holder,* 990 F.2d 1327, 1329 & n. 3 (D.C.Cir.

1993) (when person found *inside* apartment being searched and only five feet from a "drug-laden table," it didn't matter "[w]hether he was entering, exiting, or merely present").

ter testified that he first saw Reid "as he came out of the apartment beginning to come down the steps," the district court made no finding that Carter did, in fact, see Reid leave the apartment, instead of first sighting him coming down the stairs, or—as Reid and a corroborating witness testified—at the entrance of an apartment on the floor below. Noting only that Reid was *near* the apartment to be searched, the court concluded that the officers "had a right" to detain and search Reid "while he was on the stairway at the premises in question outside, just outside, four/four-and-a-half feet away from the object of the search [the apartment]." He was, said the court, nearer the entrance of the apartment to be searched than to the entrance of the apartment where he apparently lived. Thus, the court apparently relied on Reid's proximity to, not his emergence from, the apartment. But if the fact that a person "happens to be on premises where an authorized narcotics search is taking place" does not justify searching him for weapons, *see Ybarra,* 444 U.S. at 94, 100 S.Ct. at 343, the fact that he happens to be standing "just outside" the premises to be searched is even less availing.

Without a reasonable belief that Reid was armed and dangerous, the officers had no right to frisk him. This does not mean, however, that they could not have taken prudent steps to protect themselves. The government posits that "[a]n armed person in [Reid's] circumstances would have been in a position to make an attack from the rear just as the officers were turning their full attention to gaining entry to the apartment." Nothing in the Constitution would preclude the officers from instructing Reid, whom the officers saw to be empty-handed, to step aside or to "freeze" until the officers had filed by in the stairwell and gained entry to the apartment. Or, as several of the officers already had their weapons drawn, one of

them could simply have kept Reid in his sight either until the other officers were inside the apartment or until Reid had gone on his way, as it appears he was attempting to do.[3] A reasonable officer must to be sure watch out for potential dangers from persons nearby while she arrives at or leaves a place to be searched. But to say, as the government does, that a hypothetical "armed person in [Reid's] circumstances" could have posed a danger to the officers is to say no more than that, *if* the officers had had any reason to believe that Reid was armed, they could reasonably have believed that he was dangerous. While it is probably good police behavior to consider the possibility of an armed onlooker, that possibility, without more, does not satisfy the Fourth Amendment's "demand for specificity in the information upon which police action.is predicated," *Terry,* 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18, before an innocent-behaving onlooker can be patted down. A frisk must be based on a reasonable suspicion *"directed at the person to be frisked."* *Ybarra,* 444 U.S. at 94, 100 S.Ct. at 343 (emphasis added).

Judges ensconced in the security of their chambers are loath to second-guess the reasonableness of on-the-spot decisions by officers whose survival may hinge on their own instinctive reactions to potentially dangerous situations. We are, nonetheless, required to ensure that however important the objectives of maintaining order and safeguarding officers' lives, they do not eclipse the Fourth Amendment's guarantee that citizens be free from unreasonable searches. Here, Reid's link to alleged drug activity in the apartment was based on nothing more than his proximity to (or at best, emergence from) the apartment's entrance, and the belief that he was armed and dangerous on nothing more than general assertions about "the dangerousness and violence associated with drug activity." This precarious linkage falls short of what

---

**3.** It may also be that, under *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the officers could have questioned Reid about his reasons for having been in the apartment, and if satisfied, released him, and if not, detained him during the search to see if it produced any evidence connecting him to the suspected drug activity, at which point they could have arrested and searched him. Since

this scenario is not presented in this case, it remains for another court to determine whether *Michigan v. Summers,* which upheld such a detention of the known owner of a house, extends to someone who is merely seen leaving the premises. In any event, even assuming that the officers had reason to stop Reid, "[n]ot all stops call for a frisk." *United States v. Clay,* 640 F.2d 157, 161 (8th Cir.1981).

the Constitution requires. I respectfully dissent.