**Tyrone WILLOWBY, and Robert McKoy, a Minor, by His Guardian, Bernice McKoy, Plaintiffs**

**v.**

**CITY OF PHILADELPHIA, and Marvin Young, Police Officer, Badge No. 3033, Individually and in His Official Capacity as a Police Officer for the City of Philadelphia, and William Jeitner, Police Officer, Badge No. 2636, Individually and in His Official Capacity as a Police Officer for the City of Philadelphia, and Michael Mander, Sergeant, Badge No. 276, Individually and in His Official Capacity as a Police Officer for the City of Philadelphia, and Police Officer Richard Dominick, Badge No. 2685, Individually and in His Official Capacity as a Police Officer for the City of Philadelphia, and Police Officer Charles Shelton, Badge No. 7444, Individually and in His Official Capacity as a Police Officer for the City of Philadelphia, Defendants.**

**No. 95–CV–6143.**

United States District Court, E.D. Pennsylvania.

Nov. 15, 1996.

---

their constitutional rights pursuant to 42 U.S.C.A. sec. 1983 ("§ 1983"), Rev.Stat. § 1979, derived from § 1 of the Civil Rights Act of 1871, 17 Stat. 13.

On May 21, 1996, this court denied a motion for summary judgment by the plaintiffs and granted the defendants' motion for summary judgment in part. I dismissed the plaintiffs' state law claims against all defendants, but preserved plaintiffs' § 1983 claims against the individual defendants and the City of Philadelphia for allegedly violating the plaintiffs' Fourth Amendment rights to be free from unreasonable searches and seizures. After holding a bench trial, I make the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1. On August 4, 1993, Philadelphia police officers executed a valid search warrant for drugs, drug manufacturing equipment and drug sales proceeds at a home located at 5174 Viola Street (5174), Philadelphia, Pennsylvania.

2. Included in the team of officers who executed the warrant and raid were defendant officers William Jeitner (Jeitner), Richard Dominick (Dominick), Charles Shelton (Shelton), Marvin Young (Young), and their commanding officer Sergeant Michael Mander (Mander).

3. On August 4, 1993, late in the afternoon before the team of officers arrived at 5174, the plaintiffs Tyrone Willowby (Willowby) and Robert McKoy (McKoy) had congregated on the porch and steps of 5176 Viola Street (5176) an abandoned row home which shared a common wall with 5174 and were sitting with a group of three to five other individuals (bystanders) playing cards when the police arrived.

4. The porch of 5176 is located on the front of the house facing Viola Street. It is a raised porch set approximately three feet above street level, bordered in the front by the sidewalk and enclosed on the left and right sides by the walls of the adjacent homes which reach from floor to ceiling of the porch. The front of the 5176 porch is

Daniel Silverman, Philadelphia, PA, for plaintiffs.

Thomas M. Zaleski, Claudia L. Huot, City of Philadelphia, Law Dept., Philadelphia, PA, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SMITH, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiffs sue defendants, the City of Philadelphia and five Philadelphia police officers, alleging that the defendant police officers illegally detained and searched plaintiffs with weapons drawn while plaintiffs congregated at a vacant property adjacent to a home where police were serving a lawful search warrant. Plaintiffs seek money damages from the City of Philadelphia and the individual defendant police officers for violations of

without a wall and is set back three to five feet from the front of 5174.

5. At approximately 6:15 p.m., the defendant officers along with a team of other police officers converged on 5174 to execute the search warrant.

6. On the day of the drug raid, the raiding team of police officers had two tactical meetings to discuss the execution of the search warrant, one in the morning and one directly before the raid. It was at the latter of the two meetings that Mander instructed Jeitner, Dominick and Shelton to "secure" the area around 5174 Viola Street.

7. Those three defendant officers interpreted Mander's statement to include the area around the house, including the highway in front of 5174 and the individuals located upon the porch of the adjacent property, 5176.

8. These three officers arrived at the suspect house with a raiding party of officers in marked and unmarked police cars and carried out these instructions. All of the officers were wearing some form of demarcation, either shirts, vests or hats, indicating they were members of the Philadelphia police department.

9. Jeitner, Dominick and Shelton got out of their vehicles, identified themselves as police officers, drew their guns and walked towards 5176 Viola, along with several other officers, instructing the plaintiffs and the other bystanders on the porch of 5176 to get down on the ground.

10. The plaintiffs were on the ground ten to fifteen minutes, during which time the police were telling them to keep their heads down. At the same time a group of officers including Young and Mander had gone into 5174 to execute the search warrant.

11. While the bystanders were on the ground, police officers searched McKoy by pulling off and searching his sneakers.

12. Police officers, including Jeitner, Dominick and Shelton, then had the bystanders stand up and face a wall of the row home and commenced a pat down search. Officers also requested that both McKoy and Willowby empty their pockets so that the police

could examine the contents. The plaintiffs were then released. The entire duration of the confinement was twenty to twenty-five minutes.

## III. CONCLUSIONS OF LAW

### A. Application of Fourth Amendment Principles

Title 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This case explores the legal nuances addressing how police officers may treat persons who find themselves in the middle of a drug raid, and the responsibility and liability of those officers, their superiors and municipalities for that conduct pursuant to § 1983.

The facts of this case raise fundamental Fourth Amendment issues. In cases where police encounters impinge on an individual's rights to be free from unreasonable searches and seizures but fall short of a full scale arrest, I am instructed by the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. *Terry* required the application of objective standards of reasonableness to these encounters and mandated that intrusive police conduct be justified by a reasonable degree of suspicion that is proportionate to the degree of the intrusion. *Id.,* 392 U.S. at 29, 88 S.Ct. at 1879.

■ *Terry* held that

"... where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and

makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

*Id.,* 392 U.S. at 30, 88 S.Ct. at 1884. The line between those intrusions which are justified and those which are not is thin; the distinction necessarily depends upon the precise factual situation which confronts the officer during each encounter. *United States v. Reid,* 997 F.2d 1576, 1577 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1132, 114 S.Ct. 1105, 127 L.Ed.2d 417 (1994). *Terry*'s progeny have necessarily applied this seminal case to police encounters with individuals involving varying degrees of intrusive conduct including police stops, frisks, searches and use of guns. I analyze the defendant officers' conduct in four stages—the defendant officers' order to get down, use of guns, time of detention, and frisk and search of the plaintiffs.

### 1. "Get Down"

■ First, this court must consider the reasonableness of the police officer's decision to order the bystanders into a prone position on the porch of one house while another team of officers conducted a warranted drug raid on the adjacent house. When the raiding party arrived in front of 5174 to serve their search warrant, officers Jeitner, Dominick and Shelton were among several officers who unholstered their guns, walked towards 5176 and ordered the individuals on the porch to get down on the ground and keep their heads down.[1] All three officers have stated that their procedure with regard to the bystanders on 5176 was performed in the interest of the bystanders' and officers' safety. Specifically, Mander was asked what threat the bystanders could pose to the raiding party. His response was that "if there was any gunfire exchanged, they could have been in

the way of that." The other defendant officers also expressed their concern that gunfire could erupt from 5174 at any time before the officers had secured the house.

The Third Circuit has held that a *Terry* stop of individuals in close proximity to a house about to be searched for drugs is justified based upon safety concerns for the officers and bystanders. *See Baker v. Monroe Township,* 50 F.3d 1186 (3d Cir.1995). *Baker* held that police acted constitutionally when officers entered an apartment to execute a "no-knock" search warrant with guns drawn and ordered four individuals about to enter the apartment to "get down" on the ground until police had the apartment under control. *Baker,* 50 F.3d at 1190–2. The four individuals, a woman and her three children, were visiting another of the woman's children who lived in the apartment and were standing on the steps of the apartment when the officers commenced the raid. *Id. Baker* based its conclusion on its interpretation of two lines of cases.

The court implemented the balancing test of *Terry v. Ohio* to support its conclusion and reasoned that "the need to ascertain the Bakers' identity, the need to protect them from stray gunfire, and the need to clear the area of approach for the police to be able to operate efficiently all made it reasonable to get the Bakers down on the ground for a few crucial minutes." *Baker,* 50 F.3d at 1191.

The Third Circuit also applied the reasoning of *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), to justify the officers' control over the Bakers. In *Summers* the Court held constitutional a police detention of a suspected resident who was leaving a house where police were about to conduct a warranted drug search. The Supreme Court reasoned that "the risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers,* 452 U.S. at 702–03, 101 S.Ct. at 2593, 69 L.Ed.2d 340. Extending *Summers,* the *Baker* court noted that this reasoning

---

**1.** Trial testimony with regard to this point was inconsistent. Jeitner testified that after identifying himself as an officer he instructed the bystanders to show him their hands, as he always

does in these type of situations. This court finds the plaintiffs' testimony, that the officers directed the bystanders to lie face down on the porch with their heads down, more credible on this point.

could be applied to individuals coming or going from a home which was the subject of a search warrant in order "... to protect the police, to prevent flight, and generally to avoid dangerous confusion." *Baker, supra,* at 1190–91.

In the instant case, the bystanders were not entering or leaving the suspect house but were on the porch of a home next door to the residence subjected to the search warrant. Nevertheless, it is my view that the same justifications for ordering these individuals face down on the ground applied. Similar concerns for safety in the face of dangerous confusion, present in *Baker,* existed in this case. 5176 and 5174 were adjacent rowhomes. The porch of 5176 is within feet of the doorway of 5174. The nature of the drug raid was such that defendant officers believed gunfire might be exchanged. The police instruction to get down was clearly a warning and a safety precaution to keep the bystanders and police out of harms way. The defendants' order to the plaintiffs to get down on the ground face down was therefore reasonable under the circumstances.

## 2. Use of Guns

■ Second, I consider the reasonableness of the defendant officers' use of their guns. The defendant officers had their guns unholstered as they approached 5174 and did not reholster them until the bystanders had complied with the order to get down. There was no testimony indicating that any officer at any time pointed his gun at the plaintiffs or the other bystanders.

Both the Third and First Circuits have applied Fourth Amendment standards of reasonableness to determine that police officers' routine drawing of their weapons when approaching suspected drug transactions is justified because the likelihood of guns being present in such circumstances is great. *See Baker, supra, and United States v. Trullo,* 809 F.2d 108 (1st Cir.1987), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). In *Baker* the court stated that the unholstering of guns is not per se unreasonable as "the dangerousness of chaos is quite pronounced in a drug raid, where the occupants are likely to be armed, where the police are certainly armed, and the nature of the suspected drug operation would involve a great deal of coming and going by drug customers." *Baker, supra,* at 1192. Moreover, in *Trullo* the court determined that a *Terry* stop did not become an arrest simply because the officer displayed a gun. *Trullo, supra,* at 112. Rather, the court found that the officer's decision to draw his gun was reasonable because of the nature of drug transactions in high crime areas and the great likelihood that deadly weapons are involved in such transactions.[2] *Id.*

I cannot ignore certain factors that made it reasonable for the defendant officers to draw their guns in the instant case. As evidenced in the search warrant, just days before the raid Jeitner and Mander had witnessed individuals carrying bags containing vials of drugs across the sidewalk in front of 5176 and into 5174 and 5172 and saw sales to individuals in cars in front of 5174. *See* Plaintiffs' Exhibit 2. As the defendant officers drove to 5174 they passed another drug raid in progress at 5128 Viola Street, in the same neighborhood as 5174 and 5176. Certainly, the nature of a raid on a crack house where drugs are sold to customers on a walk-in and drive-through basis is such that perpetrators are likely to carry guns and the risk that gunfire will be exchanged is great.

Furthermore, Jeitner, Shelton and Dominick all testified that, in their experience when

---

2. The relevant language in *Trullo* was as follows: "... the officer suspected appellant of dealing in narcotics, a pattern of criminal conduct rife with deadly weapons. The officer's reasonable suspicions justified the stop. He testified that he had seen many drug transactions take place and the conduct of appellant was consistent with such a transaction. Appellant was stopped in a high crime area. From his experience, the officer knew the area harbored a large number of individuals who carried deadly weapons. While the time of day and the reaction of appellant arguably might be said not to weigh in justification of displaying a gun, the other factors clearly support the officer's decisions." *Trullo,* 809 F.2d at 112. The court noted that the location of the stop was the "main street" of a portion of Boston known as the "Combat Zone," a high crime area notorious for its prostitution and drug dealing. *Id.*

an officer encounters a drug transaction he is likely to encounter guns. Of course the officers' experience is not a talisman before which the Fourth Amendment requirements of reasonableness disappear. However, examining the officers reasoning in the totality of the circumstances it was highly reasonable that they have their guns drawn, not pointed at any bystanders, yet prepared to return gunfire from the house subject to the search warrant. *See Baker* and *Trullo, supra.*[3]

### 3. Time of Detention

■ Penultimately, I consider the closer question of whether the police detained plaintiffs for an unconstitutionally long time. There is no *per se* rule about the length of time officers may detain individuals before the detention becomes an arrest. *Baker,* 50 F.3d at 1192. Instead, the Third Circuit has examined the reasonableness of the detention time, particularly examining whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible. *Id.* (*citing United States v. Sharpe,* 470 U.S. 675, 682–83, 105 S.Ct. 1568, 1573–74, 84 L.Ed.2d 605 (1985)).

Jeitner, Shelton and Dominick all testified that the purpose of the detention was to assure the safety of the police and the bystanders. Jeitner also stated that they were detaining the bystanders so that Officer Young could identify whether any of the individuals he had seen in the previous days of surveillance were present. Had the latter explanation been accurate perhaps the duration of the twenty to twenty-five minute detention would have been reasonable. However, this explanation does not seem credible in light of Officer Young's testimony that he was not assigned the task of identifying individuals at 5176 and that he had no intention of doing so. Therefore, the length of the detention became unreasonable when the officers had control of the circumstances yet continued to detain the plaintiffs and other bystanders for reasons other than safety and identification.

### 4. Search

■ Lastly, I consider the defendant officers' frisk and search of the Plaintiffs. McKoy testified that while he was on the ground the police began searching the individuals located around him on the porch, then they took off his shoes and searched them. The police required both McKoy and Willowby to empty their pockets. Additionally, Jeitner, Dominick and Shelton all testified that they ordered the bystanders to stand against the wall and all three participated in the pat down search of the bystanders. It is apparent that the defendants' detention of the plaintiffs was not solely for safety or identification. It is clear that the officers were looking for weapons and evidence.

The Fourth Amendment provides that searches and seizures shall not be "unreasonable". A two-step analysis has emerged from *Terry* by which courts evaluate the reasonableness of government intrusions into an individual's security. After *Terry,* courts must inquire: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place". *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d 889. Of course, searching an individual's outer clothing in a pat down search for weapons is less intrusive than searching an individual's person for evidence which may include having an individual remove his clothing and shoes and emptying his pockets. Accordingly, the latter requires an increased level of justification.

Not all *Terry* stops call for a frisk. *United States v. Clay,* 640 F.2d 157 (8th Cir.1981). Protective searches for weapons are authorized only when the police officer has a reasonable suspicion that the individual before him is involved in criminal activity and may be armed or otherwise presently dangerous. *Sibron v. New York,* 392 U.S. 40, 65–67, 88 S.Ct. 1889, 1903–4, 20 L.Ed.2d 917 (1968).

**3.** *See also, United States v. Eisenberg,* 807 F.2d 1446, 1451 (8th Cir.1986) (stating that officers may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo so that the limited purpose of the stop may be achieved and that officers approaching a vehicle with weapons drawn will not *per se* transform the stop into an arrest).

As stated above, there is no bright line test by which one may distinguish reasonable from unreasonable police conduct. However, cases decided after *Terry* provide a comparative scale of reasonableness with those intrusions into an individual's security which have been deemed reasonable at one end and those which have not at the other. I find a few of these cases particularly relevant. In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court refused to uphold a search and seizure of patrons in a public tavern that was being searched lawfully pursuant to a warrant. The Court held that

> "... nothing in *Terry* can be understood to allow a generalized cursory search for weapons or indeed, any search whatever for anything but weapons. The narrow scope of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place."

*Ybarra,* 444 U.S. at 93–94, 100 S.Ct. at 343, 62 L.Ed.2d 238 (internal quotations omitted). The Court explained that the frisk of Ybarra was unjustified because the police knew nothing about Ybarra "except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.; see also Sibron,* 392 U.S. at 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (the Court held that a police officer's "inference that people who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.").

The frisk and search in this case occurred on a public sidewalk not unlike the public setting of the bar in *Ybarra,* however, before they conducted their frisk, the defendant officers here were aware of no more information about these bystanders than the officers were of Ybarra. Neither Jeitner, Dominick nor Shelton had any articulable suspicion that any of the bystanders were involved in any criminal activity or that they possessed weapons. Furthermore, although it is more likely that individuals sitting on a front porch next door to a house where drugs are sold would know about that activity, it is no more likely that they would be involved in that activity than the patrons of a bar where drugs are sold would be involved in that criminal activity.

At the other end of the scale, the District of Columbia Court of Appeals held that officers executing a search warrant for narcotics on an apartment acted reasonably when they stopped an individual and searched him for weapons after seeing the individual leave the suspect apartment and walk to the stairs. *United States v. Reid, supra.* The court deemed the stop and frisk reasonable in light of the officer's testimony that in his experience there was always a chance that there will be weapons on the premises or on persons in the premises when a search warrant for narcotics is executed. *Id.* at 1577.

The defendants argue that the instant case falls under the reasoning of *Reid* but fail to account for the distinguishing factor that Reid had been within the premises subject to the search warrant when the police arrived. Similar to the officers in *Reid,* the defendant officers here proclaimed that in their experience where there are drugs there are sure to be individuals with weapons in the vicinity. However, as stated above, an officer's experience is not a talisman before which the reasonable suspicion requirement of the Fourth Amendment will disappear. I appreciate and value the officers' concern that these bystanders could have had weapons and Jeitner, Dominick and Shelton's desire to remove any possibility that an armed individual in close proximity to the suspected drug house would use a weapon against police with an element of surprise. However, the state of the law in this country is such that law enforcement officers do not possess the necessary justification for a pat down search of an individual absent a warrant or probable cause for arrest unless they have an articulable suspicion that the individual is engaged in criminal activity and is armed and dangerous. *Terry v. Ohio,* 392 U.S. at 30, 88 S.Ct. at 1884; *see also, Minnesota v. Dickerson,* 508

U.S. 366, 113 S.Ct. 2130, 2132, 124 L.Ed.2d 334 (1993); *Ybarra,* 444 U.S. at 86, 100 S.Ct. at 339; *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *United States v. Kikumura,* 918 F.2d 1084, 1092 (3d Cir.1990). It is not unforeseeable that an officer conducting a drug search on one home may be engaged by weapon toting individuals from the neighboring porch. Indeed in the factual context of this case where simultaneous drug raids were occurring within 100 yards of one another at 5128 and 5174 Viola Street, and prior police surveillance had shown the area to be fraught with drug activity, it would not be unreasonable for police to entertain a heightened state of anxiety. But a citizen should not find his constitutional safeguards lessened because of the criminality of his neighbor. One must apply the same law to the row homes of Viola Street as to the larger tracts of suburbia.

It is clear from the trial testimony that the defendant officers did not witness anything nor were they given any information that would indicate these bystanders were involved in any criminal activity. They were not privy to any information or events indicating a relationship, even an attenuated one, between the bystanders and the suspected drug activity at 5174 Viola Street.

The court in *Reid* observed that: "it does not stretch the imagination too much to conjure up a fact situation where a bar patron might be a reasonable target for a "stop and frisk" notwithstanding the *Ybarra* precedent ..." *Reid,* 997 F.2d at 1579. Similarly, it is possible that a scenario would emerge where it would be reasonable to frisk bystanders or neighbors in close proximity to a crack house. However, no such scenario exists on the facts of this case. Accordingly, this court holds that the defendant officers, Jeitner, Shelton and Dominick's frisk of the plaintiffs was unconstitutional and violated the plaintiffs' Fourth Amendment right to be free from unreasonable search and seizure.

The police also conducted an unreasonable search on plaintiffs when they took off McKoy's shoes and forced the plaintiffs to empty their pockets. It is clear that this was an unjustified search for weapons and evidence. *See Baker,* 50 F.3d at 1194–95 (the court held that it was reasonable to detain but not to conduct a search for evidence upon the person of individuals about to enter a house upon which officers were executing a search warrant). However, plaintiffs failed to identify any of the defendant officers as an individual who conducted these searches for evidence.

## B. *Liability*

### 1. Municipality's liability under Section 1983

■ A municipality is subject to § 1983 liability in cases where the plaintiff shows that the municipality itself, through the implementation of a custom or policy, causes some violation of the plaintiffs' rights under the Constitution. *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 692 (3d Cir.1993); *Colburn v. Upper Darby Township,* 946 F.2d 1017, 1027 (3d Cir.1991) (both citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691–95, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978)). Regarding the "failure to train" allegation, the Supreme Court has held that a defect in police officer training can serve as the basis of a § 1983 claim, but only "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

The plaintiffs have not shown that any of the defendants are policy makers for the City of Philadelphia, nor have they shown any evidence of City practices regarding unreasonable searches of bystanders at the site of otherwise warranted raids and searches. Therefore, plaintiffs have failed to show the City formally or informally approved a policy which resulted in the violation of their rights. Plaintiffs' accounts of what happened in this case do not establish a custom or usage of practices which would be the proximate cause of the violation of their civil rights. *See Baker, supra* at 1194 (citing *City of Canton,* 489 U.S. at 391–92, 109 S.Ct. at 1206, 103 L.Ed.2d 412).

2. Individual officers' liability under § 1983

a. Qualified Immunity

■ The United States Supreme Court provided the current standard for "good faith" or "qualified" immunity in *Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982):

"... government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

This circuit has adopted the approach that officials must know and apply general legal principles in appropriate factual situations. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Pro v. Donatucci,* 81 F.3d 1283, 1291–92 (3rd Cir.1996) *(citing Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Although officials need not predict the future course of constitutional law, they are required to relate established law to analogous factual settings. *See Pro v. Donatucci, supra,* at 1292; *see also Young v. Keohane,* 809 F.Supp. 1185, 1191 (M.D.Pa.1992). In the absence of a case applying established principles to the same facts, this court must inquire whether, in light of decided case law, reasonable officers would have believed that their conduct would be lawful. *Lattany v. Four Unknown U.S. Marshals, et al.,* 845 F.Supp. 262, 265 (E.D.Pa.1994).

The defendant officers do not merit qualified immunity here. While I find no fault in the officers' decision to draw their guns and detain plaintiffs, once the raided premises was secure, the right to control plaintiffs' movement ended. The defendants at no time possessed the constitutional right to frisk or search plaintiffs. They were in violation of clearly established constitutional law when they did so.

Officers Jeitner, Shelton and Dominick testified that when they began their pat down search and before the police removed McKoy's shoes and asked Mckoy and Willowby to empty their pockets they did not have any suspicion that the plaintiffs or any of the bystanders were engaged in any criminal activity, or that the bystanders were armed or dangerous. They testified that at no point did they develop such a suspicion. Furthermore, officer Jeitner testified that when he commences a drug raid, as he did here, he assumes every one has a gun until he has searched individuals to convince himself otherwise. There is no constitutional law that would prohibit officers from proceeding cautiously in a drug raid because they have such an assumption. However, in light of *Terry* and *Ybarra,* a reasonable officer would not conclude that it is constitutionally permissible to search bystanders located on a porch of a home next door to a house subject to a warranted search without something more than that assumption. Therefore, in accordance with *Harlow,* the conduct of the individual defendants does not merit qualified immunity.

b. Supervisory liability

■ In order to render a supervisor personally liable under § 1983, the plaintiffs must show that he participated in violating their rights, or that he directed others to violate them, or that he, as the person in charge of the raid, had knowledge of and acquiesced in his subordinates' violations. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Plaintiffs have not shown that Mander or Young knew of or acquiesced in the frisk and search of the plaintiffs. Both Mander and Young entered the suspect house, 5174, before the bystanders were detained and searched and did not emerge from the house until the search was concluded. Both were occupied with tasks in 5174 that would preclude them from seeing a search of the plaintiffs as they stood against the wall of 5176.

Furthermore, neither Sergeant Mander nor Officer Young directed the defendant officers to act in a way that violated the plaintiffs' civil rights. Mander ordered his men to secure individuals on the premises adjacent to 5174. There is no doubt that Mander was referring to the bystanders on

the porch and steps of 5174. However, in order to conclude that Mander directed his men to search the plaintiffs, I must find that he intended that the officers under his supervision search those individuals or knew that they would interpret his instruction as a direction to do so. The facts here do not support such a conclusion. While Mander's order seems susceptible to varying interpretations, I conclude that, with regard to the bystanders, he was directing his men to keep the bystanders from harms way and prevent them from interfering with police activity for the safety of the bystanders and the officers. Accordingly, neither Mander nor Young will be assessed any supervisory liability for the conduct of the other defendant officers.

### C. *Damages*

 As the Supreme Court held in *Memphis Community School District v. Stachura,* 477 U.S. 299, 306, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986), "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." The Court in *Stachura* held that "compensatory damages may include not only out-of-pocket loss and other material harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)).

Having concluded that the defendants violated the plaintiffs' Fourth Amendment rights by unreasonably detaining and searching them, I find that each plaintiff is entitled to an award of damages. While the constitutional insult is of some magnitude, the injuries suffered by plaintiffs are slight. Neither plaintiff suffered physical injury and the trauma they suffered dissipated shortly after the incident; more so in Willowby's case than in McKoy's. Both plaintiffs testified that they now fear and do not trust police officers as a result of the incident. McKoy also suffered from nightmares and public embarrassment in his neighborhood as a direct result of the incident. In light of these facts

I find that Tyrone Willowby is entitled to compensatory damages in the amount of $500. I find that Robert Mckoy is entitled to compensatory damages in the amount of $1000. An appropriate order follows.

### *ORDER*

AND NOW, to wit, this 15th day of November, 1996, following non-jury trial, and in accordance with my Findings of Fact and Conclusions of Law, it is hereby ORDERED that:

1. JUDGMENT is entered in favor of defendants City of Philadelphia, Police Officer Marvin Young and Sergeant Michael Mander, and against plaintiffs Tyrone Willowby and Robert McKoy, a minor, by his guardian, Bernice McKoy.

2. JUDGMENT is entered in favor of plaintiffs Tyrone Willowby and Robert McKoy, a minor, by his guardian, Bernice McKoy, and against defendants Police Officer William Jeitner, Police Officer Richard Dominick and Police Officer Charles Shelton.

3. Compensatory damages are AWARDED to plaintiff Tyrone Willowby in the amount of $500.00.

4. Compensatory damages are AWARDED to plaintiff Robert McKoy, a minor, by his guardian, Bernice McKoy, in the amount of $1,000.00.