**Suron JACOBS, Plaintiff,**

v.

**VILLAGE OF OTTAWA HILLS,
et al., Defendants.**

No. 3:99CV7082.

United States District Court,
N.D. Ohio,
Western Division.

Feb. 25, 2000.

Alan S. Konop, Toledo, OH, for Plaintiff.

William S. McCready, Ritter, Robinson, McCready & James, Toledo, OH, Joan C. Szuberla, Spengler & Nathanson, Toledo, OH, for Defendants.

ORDER

CARR, District Judge.

This is a civil rights case brought under 42 U.S.C. § 1983 and related state claims. Pending is defendants' motion for summary judgment (Doc. 20) and plaintiff's motion for partial summary judgment. (Doc. 19). For the reasons that follow, defendant's motion shall be granted in part and denied in part and plaintiff's motion shall be denied.

### Factual Background

On September 28, 1998, plaintiff, a construction worker, was working at the Ottawa Hills High School, located about a block north of the intersection of Indian and Evergreen Roads in the Village of Ottawa Hills, Ohio. He had made arrangements with his brother to meet during his lunch break, which was from 11:30 a.m. to 12:00 noon. He testified that he arrived at the intersection at 11:33 a.m., and had been waiting for about ten minutes when defendant Michelle Miller, an Ottawa Hills Police Officer, arrived at the intersection.

Plaintiff also stated that, when he had first come to the intersection, he saw two officers in separate patrol cars. Shortly after plaintiff arrived, the officers left.

Sometime after 11:30 a.m., someone called the Ottawa Hills Police Department:

Caller: There's a guy—a guy on the corner of Evergreen and Indian—sitting on the fire ... he was sitting on the fire extinguisher [i.e., hydrant] ... doesn't look like he has a purpose and I just want to make sure the children are safe.

Dispatcher: What's he look like?

Caller: Um, he's wearing a baseball cap, he's a black guy, tee-shirt, I don't know what else, but I just want to make sure the children are safe up and down Indian.

Dispatcher: He's sitting there on the corner, huh?

Caller: Just sittin' there on the corner.

Dispatcher: Okay what's your name? '

Caller: Pardon me?

Dispatcher: What's your name?

Caller: Oh, well. (nervous chuckle/laughter)

Dispatcher: Mrs. Anonymous?

Caller: Yes.

Dispatcher: Okay, thank you, bye.

(Doc. 23, Exh. D).

After this call, the dispatcher radioed an instruction, to which defendants Miller and another Ottawa Hills Police Officer, James Knallay, responded. The dispatcher used the code, "check an adult," gave a description of the individual, and stated that he "may be lost or confused."

Officer Miller arrived at the corner of Indian and Evergreen Roads at 11:47 a.m. She saw the plaintiff, Suron Jacobs, and turned on her rear flashers.

The Ottawa Hills elementary school is located about a block to the east of the intersection. The pupils' lunch hour is from 11:10 a.m. to 12:05 p.m. There is no evidence in the record that any school children were either headed home or back to school during the ten minutes that plaintiff was at the corner waiting for his brother.

After Officer Miller arrived, she approached the plaintiff, and asked him if he needed help, or what was going on. Plaintiff assured her that he was "all right." Officer Miller then asked if plaintiff were waiting for a ride or if someone was going to pick him up. He told her, "No, I'm supposed to be meeting my brother here."

At that point, according to plaintiff, Officer Miller asked, "What's your brother's name?"

Plaintiff said, "Well, wait a second, when you first approached me you seemed as if you were here to help me. Now you're making me feel as if you're here to harass me. What's the problem. I can't sit right here[?]"

Officer Miller said, "No, it's not that. It's just that somebody called in on you." Plaintiff responded, "Called in on me[?] Wait a second, [t]his is starting to seem like some racial stuff because I'm not doing anything wrong."

Then, according to plaintiff, Officer Miller made a comment to the effect of "don't give me that." At that point, plaintiff refused to give his brother's name, and according to his testimony (which is disputed), told Officer Miller that he was going back to the school.[1]

Although the plaintiff knew that Officer Miller was still asking him questions, he started across Indian Road toward the High School. Officer Miller told him to stop. Plaintiff continued walking, and Officer Miller grabbed him. Plaintiff pulled his arm away, and, facing Officer Miller, asked her what the problem was. Officer Miller grabbed him again, and he again pulled his arm away. He told Officer Miller she had better not hit him again.

In the meantime, Officer Knallay had arrived on the scene. He and Officer Miller grabbed the plaintiff, handcuffed him, took him to Officer Miller's cruiser, and placed him in the back seat. He was taken to the police station and charged with obstructing official business and resisting arrest.

---

1. Officer Miller's account varies somewhat from plaintiff's. At the outset plaintiff told her he was fine and was waiting for his brother. When she asked him when his brother was coming, he told her that his brother was not coming to get him. When asked why he was at the corner, he told her that he was waiting for his brother. Then he said she was harassing him and would not have questioned him if he were white. She then told him that someone had called and asked that a patrol officer check on him. She again asked when his brother was coming. She was concerned, and increased the distance between the two of them. Plaintiff, according to her testimony, was upset. She stated that she ordered plaintiff to stop several times as he started to walk away. She was concerned that he might strike her. Though she had asked plaintiff for some identification, he had refused to provide it.

Officer Miller testified that plaintiff had not been free to leave at any time during the encounter. She justified her actions on the basis of a suspicion that plaintiff was in an area with a high volume of traffic by school children, would not answer her questions, and had quickly become defensive. The dispatcher had told her to conduct an investigation to check on the individual who had been seen where plaintiff was found. She was not satisfied with his answers, which were increasingly suspicious, "as if something were mentally wrong." She had never encountered someone who had "become this defensive and hostile with me."

### Defendants' Motion for Summary Judgment

### I. Claims Against Individual Officers

### A. Federal Claims

### 1. Fourth Amendment

Plaintiff claims that the events culminating in his arrest violated his right under the Fourth Amendment to be free from unreasonable seizures. Defendants acknowledge that the plaintiff was seized, as that term is used in the Fourth Amendment. In support of their motion for summary judgment, the defendants contend, however, that such seizure began as a lawful investigatory stop, and that their actions thereafter conformed to the Constitution. Defendants also argue that, even if the plaintiff was seized unlawfully, they are entitled to qualified immunity, and thus are not liable to the plaintiff.

### a. Unlawful Seizure

The Sixth Circuit has frequently described three types of police-citizen encounters: 1) an arrest, which must be based on probable cause; 2) an investigatory stop, which is a limited, non-intrusive detention and requires reasonable suspicion based on articulable facts (commonly referred to as a *"Terry* stop"); and 3) consensual encounters, which involve a citizen's voluntary cooperation and requires no suspicion. *See, e.g., United States v. Dotson,* 49 F.3d 227, 230 (6th Cir.1995); *United States v. Flowers,* 909 F.2d 145, 147 (6th Cir.1990).

While the parties agree that the encounter between plaintiff and the defendant officers did not, at least at the outset, involve an arrest, they disagree about its nature at its inception. Plaintiff characterizes the encounter as consensual, until he decided to leave. The defendants contend that the encounter was a lawful "Terry stop," which entitled them to detain the plaintiff until such time as their concerns about possible criminal conduct were dispelled.

Determination of the nature of the encounter, and the rights and responsibilities attendant thereto, is not dependent on the parties' characterizations. What matters is whether, as a matter of law, the officers could lawfully do what they did.

■ The first question is when the plaintiff was seized. In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court held that whether a person has been seized depends on whether, under all the circumstances, a reasonable person would have believed that he or she was free to leave.[2]

Based on the undisputed facts in the record, plaintiff was not seized while he was sitting on the hydrant before Officer Miller drove up, got out of her cruiser, and came over to him. At that point, no reasonable individual would have believed that he was not free to leave.[3] There had been

---

**2.** The finding that a person was seized involves a question of fact. *United States v. Taylor,* 956 F.2d 572, 576 (6th Cir.1992) (en banc).

**3.** Whether Officer Miller believed that the plaintiff was not free to leave even as she first approached him is immaterial. Fourth Amendment rights are not defined by an police officer's subjective beliefs. *See, e.g., United States v. Anderson,* 923 F.2d 450, 457 (6th Cir.1991) (officer's subjective belief re. probable cause to arrest not determinative); *United*

no display of force or assertion of authority or control, and thus no basis whatsoever for a reasonable person to apprehend that he was not free to walk away.

Moreover, under the undisputed facts in this case, a reasonable individual would have continued to believe that he was free to leave while he was merely being asked questions. *See, e.g., United States v. Erwin*, 155 F.3d 818, 823 (6th Cir.1998) (en banc) (citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)) ("[a] law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and asking him whether he is willing to answer some questions."); *United States v. Garcia*, 866 F.2d 147, 150 (6th Cir.1989) ("an officer may approach a traveller [sic] and request to speak to him, and may continue that conversation up to the point that a reasonable person would no longer feel that the person was free to go.").

A reasonable person would consider himself free to leave until he was commanded not to do so or physically restrained. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen."). *See United States v. Taylor*, 917 F.2d 1402 (6th Cir.1990) (defendant was seized when, after being approached by three officers after leaving an airline terminal, he was pulled back by one of the officers and asked a barrage of questions that he felt compelled to answer); *Ramirez v. Webb*, 719 F.Supp. 610, 616 (W.D.Mich.1989) (I.N.S. officer seized a father and two sons when the officer grabbed one of the sons as he was about to enter the family pickup truck).

■ I conclude, accordingly, that a seizure occurred when Officer Miller told the plaintiff to stop and physically sought to keep him from continuing to walk away. Whether she acted lawfully depends on whether, when she did so, she had a reasonable suspicion that the plaintiff was engaged or about to be engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996) (police officers may briefly stop an individual for investigation if they have a reasonable suspicion that the individual has committed a crime).

■ " 'Reasonable suspicion,' " the Supreme Court stated in *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), "is more than an ill-defined hunch; it must be based upon 'a particularized and objective basis for suspecting the particular person ... of criminal activity.' " As enunciated by the Supreme Court in *Terry*, reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. 392 U.S. at 21, 88 S.Ct. 1868.[4]

The reasonable suspicion standard as "outlined in *Terry* and its progeny is not onerous." *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir.1999). In *McPherson v. Kelsey*, 125 F.3d 989, 993 (6th Cir.1997) (citing

States v. Hurston*, 12 F.Supp.2d 630, 635 (E.D.Mich.1998) (issue "is not whether the officer's state of mind ... provides the legal justification for the arrest, but whether the circumstances, viewed objectively, justified" the officer's actions).

4. Determination of whether reasonable suspicion exists is a mixed question of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*Sokolow, supra,* 490 U.S. at 7, 109 S.Ct. 1581), the court said the requisite level of suspicion " 'is considerably less than proof of wrongdoing by a preponderance of the evidence.' " Moreover, as stated by the Supreme Court in *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause. *Accord, McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997).

Defendants argue that reasonable suspicion justifying Officer Miller's actions arose from the anonymous tip and the directive from the dispatcher to "check an adult" who "may be lost or confused." In defendants' view, this information justified detaining the plaintiff until the officers were satisfied that nothing was amiss.

Defendants do not contend that the anonymous tip provided a basis for believing that the plaintiff had committed or was about to commit a crime. Indeed, as in *United States v. Packer,* 15 F.3d 654 (7th Cir.1994), the tip in this case was clearly insufficient to justify detention of the plaintiff.

In *Packer* officers responded to a citizen's call reporting a suspicious vehicle parked, at 1:00 o'clock in the morning, along the street. The district court found that the officers had a "sufficient degree of suspicion" to justify the stop because of the citizen's report, the lateness of the hour, the fogged car windows, and the officers' reasonable belief that the Cadillac was the one reported in the dispatch. The Seventh Circuit disagreed:

> Although the early morning hour undoubtedly adds to the reasonableness of the officers' suspicion that perhaps something unusual may have been afoot, the record does not suggest any specific irregularities in the car, other than the windows being all fogged up with the four individuals sitting inside. While the car had in fact been parked there for more than an hour, other than the opaque mist on the windows, no evidence shows that the officers were aware of how long the car had been parked.

> In cases where *Terry* stops were found to be justified by reasonable suspicion, the law enforcement officer generally has observed or has received a report of more suspicious activities than four men sitting together in a parked car at the wee hours of the morning.
>
> \*  \*  \*  \*  \*  \*
>
> Moreover, in the instant case the officers were not aware of any specific crime being committed in the area. Nor did the officers' decision to stop the vehicle rely on the general level of the neighborhood's crime rate. While stating that there was "generally crime happening" in the area, Officer Buetow testified that it was not a factor in the officers' decision to approach the vehicle.

> The Supreme Court has held that an anonymous telephone tip, if corroborated by independent police work, could exhibit sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop. *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). However, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Id.* at 329, 110 S.Ct. at 2416. The telephone call in this case simply reported that a "suspicious" Cadillac was parked at a certain location with four black men sitting inside. While the word "suspicious" suggests by itself at least a modicum of questionable activity, the caller did not describe any definite wrongdoing in progress. Thus, although the caller's description of the vehicle and its location was corroborated by police observation, the police lacked the minimal detail of information that would point to any arguably particularized suspicion of criminal conduct.

15 F.3d at 658 (select citations omitted).

Here, as in *Packer,* "the caller did not describe any definite wrongdoing in prog-

ress." Consequently, Officers Miller and Knallay, like the officers in *Packer*, "lacked the minimal detail of information that would point to any arguably particularized suspicion of criminal conduct."

Failing to specify what criminal conduct might reasonably have been perceived to have been afoot, or to articulate any basis for any such belief, the defendants argue that Officer Miller's "developing suspicions," based on plaintiff's "words and actions," provided a lawful basis for restraining him as he sought to depart. In support of this contention, the defendants point to plaintiff's: 1)"contradictory" answers to Officer Miller's initial questions; 2) refusal to answer further questions; 3) accusation that he was being harassed; and 4) attempt to leave despite his knowledge that Officer Miller had further questions for him.

Defendants do not specify just what Officer Miller's "developing suspicions" caused her to be suspicious of. Instead, defendants assert that Officer Miller had "an obligation to determine why Mr. Jacobs was sitting at an intersection where school children would be walking back to school and where it was not customary for people to sit." (Doc. 20). Absent reasonable suspicion about criminal conduct, this "obligation" merely entitled Officer Miller to ask questions–and nothing more.

In making their argument that Officer Miller lawfully restrained the plaintiff, defendants overlook the fundamental right of every citizen, when approached by a police officer who lacks reasonable suspicion of criminal activity, to refuse to answer the officer's questions and walk away. *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319 (1983) ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way."); *Terry, supra*, 392 U.S. at 32–33, 88 S.Ct. 1868 (just as an officer has a right to ask questions, "ordinarily the person addressed has an equal right to ignore his interrogator and walk away.") (Harlan, J., concurring); *United States v. Woods*, 720 F.2d 1022, 1026 (9th Cir.1983) ("The person so questioned need. not answer any questions and is legally free to ignore the officer, or to walk away."); *United States v. Giuliani*, 581 F.Supp. 212, 217 (N.D.Ill.1984) (same); *see also United States v. Saperstein*, 723 F.2d 1221, 1233 (6th Cir.1983) (Merritt, J., dissenting) (same); *United States v. Madison*, 125 F.3d 856 (6th Cir.1997) (Table) (same).[5]

Where a citizen elects to exercise his fundamental right to walk away from an officer, "[h]e may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Royer*, 460 U.S. at 498, 103 S.Ct. 1319. Defendants point to plaintiff's refusal to answer any further questions and attempt to leave as justification for seizing him. But *Royer* makes unequivocally clear that the plaintiff's exercise of his right to ignore the officer's desire to ask further questions and leave cannot justify a *Terry* seizure.

The only other articulable facts to which defendants point to justify seizure of the plaintiff by Officers Miller and Knallay is that he gave "contradictory answers" to Officer Miller's questions and he complained about being harassed.

With regard to the "contradictory answers," Officer Miller testified that, after plaintiff told her he was waiting for his

---

5. The defendants assert that, "[h]ad Jacobs made a simple explanation, the encounter would have quickly ended." (Doc. 20 at 6). Implicit in that argument is the perception that a citizen has a duty to respond to a policeman's inquiries. That may be-indeed, is-true in a police state. But that is not how the Fourth Amendment, which favors the individual and fosters liberty, structures the relationship between an officer and a citizen. Under the Fourth Amendment, it is the officer who must comply with the citizen's desire to be left alone, rather than the citizen who must submit to the officer's command to keep answering questions.

brother, he also stated that his brother was not coming to get him. Then, when asked again why he was waiting at the corner, the plaintiff again repeated that he was meeting his brother. There is simply nothing inherently contradictory in that series of responses, which can readily be interpreted as stating that the plaintiff was waiting for his brother, whom he was meeting there, although his brother would not be taking him anywhere. In any event, if the statements could be viewed as "contradictory," they hardly gave rise to a reasonable suspicion that something criminal was afoot.

Finally, plaintiff's complaint about being harassed likewise is not indicative of any criminal conduct on his part. The Constitution does not protect only the courteous, or those who respond in ways that the police find predictable and acceptable. Hostility in the response to an officer's questions may be offensive to the officer, but it is not an offense against the peace and dignity of the community. An abrupt departure may be rude, but it does not give rise to reasonable suspicion that a crime is being committed. In this case, plaintiff's statements about feeling harassed were simply another indication that he did not want the encounter to continue. As such, those statements, like his refusal to answer further questions, did not justify detaining him or taking him into custody.

In their brief, defendants make a passing reference to the "community caretaking function" of the police. (Doc. 20 at 13). To the extent that they argue that the officers were performing such function because they had been told that the plaintiff may have been "lost or confused," that contention is likewise not well taken.

The caretaking exception to the warrant requirement arises from, and has most often has been applied in, cases involving seizure or inventory of motor vehicles. *See e.g., South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Smith v. Thornburg*, 136 F.3d 1070, 1075 (6th Cir.1998). On occasion, the caretaking function has extended to warrantless entry into private premises, usually in response to manifestations of criminal conduct. *See, e.g., United States v. Johnson*, 9 F.3d 506, 510 (6th Cir.1993) (officers observed broken window and individuals inside residence while responding to burglary report); *United States v. York*, 895 F.2d 1026, 1029 (5th Cir.1990) (occupant had become belligerent and was threatening others, including children).

■ The Sixth Circuit also has approved warrantless entry in response to excessively loud music coming from a residence, where the officers' efforts to alert residents to their presence had been unsuccessful. *United States v. Rohrig*, 98 F.3d 1506, 1521 (6th Cir.1996) ("by entering Defendant's residence for the limited purpose of locating and abating a nuisance, the officers sought to restore the neighbors' peaceful enjoyment of their homes and neighborhood.").

In a handful of cases courts have applied the caretaking exception as defendants want it applied here: i.e., where officers have acted to protect an individual from endangering himself or others. *See Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th Cir.1997) (officers responded to reports of a suspicious person or prowler in the neighborhood and about a drunken individual quarreling with a woman; "[t]his was not a case of police officers arbitrarily stopping an individual [on] the sidewalk during the middle of the afternoon"); *United States v. Rideau*, 949 F.2d 718, 720 (5th Cir.1991), *vacated on other grounds*, 969 F.2d 1572 (5th Cir.1992) (en banc) (agreeing with panel on this point) (officers stopped defendant for his own safety and the safety of others after observing him standing in the middle of the road at night, dressed in dark clothes, and apparently intoxicated); *United States v. Wallace*, 889 F.2d 580, 582 (5th Cir.1989) (officers detained defendant for his own safety after being informed that

he possessed gun and had threatened suicide); *United States v. Miller*, 589 F.2d 1117 (1st Cir.1978) (where the circumstances justified a reasonable fear of a drowning, officers could board an abandoned vessel to determine its ownership and protect safety of its mariners); *United States v. Nord*, 586 F.2d 1288 (8th Cir. 1978) (officers entered defendant's apartment on being summoned there by a third person, who told officers that he was concerned because defendant was intoxicated).

None of these cases provides authority for the putative exercise of the caretaking function in this case. Even if the original caller had told the dispatcher that the plaintiff was lost and confused, that condition would not have justified taking the plaintiff into custody. Being lost and confused is a common incident of being abroad in unfamiliar surroundings. Standing alone, such condition is not indicative of criminal activity, and a lost or confused individual is just as entitled to walk away from a police officer as is an individual who, like the plaintiff, knows where he is, why he is there, and what he wants to do.

Finally, defendants argue in their reply brief that the Supreme Court's recent decision in *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), supports their claim that Officers Miller and Knallay had reasonable cause to seize the plaintiff when he started to walk away before Officer Miller was done questioning him. In that case officers patrolling in an area known for its narcotics trafficking saw a man flee as they approached. The Supreme Court held that "in an area of heavy narcotics trafficking ... [h]eadlong flight ... is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it certainly is suggestive of such." *Id.* at ——, 120 S.Ct. at 676.

According to defendants, *Wardlow* provides support to their contention that the plaintiff's effort to walk away (which they

appear to equate with "headlong flight") provided the officers with sufficient reason to restrain him. That conclusion is, however, premised on their misperception that the officers already had information that tended to show that the defendant was engaged or about to be engaged in unlawful activity. As previously discussed, there is no basis for that premise.

Rather than fleeing from the officers, the defendant was, as also previously discussed, exercising the right of every citizen to break off an encounter where officers do not have a reasonable belief, based on objective and articulable facts, that he or has committed or is about to commit a crime. *Terry, supra; Royer, supra.* The decision in *Wardlow*, which was based on facts significantly different from the facts in this case, provides no support for defendants' claim that they were entitled to restrain the plaintiff as he started to walk away.

Defendants, accordingly, could not lawfully detain the plaintiff once he sought to break off the encounter. The Fourth Amendment required them to let him leave without restraint or delay. In light of basic and fundamental Fourth Amendment principles, the defendants' efforts to impede plaintiff's departure and their decision to arrest him had no lawful basis. Defendants are not entitled to summary judgment.

### b. Qualified Immunity

■ Officers Miller and Knallay assert that they are entitled to qualified immunity on the basis that they violated no clearly established constitutional right of which they were or reasonably should have been aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[6] Despite defendants' assertion that they are unaware "of no case law, in the Sixth Circuit or elsewhere, which put Officers Miller or Knallay on notice that they were violating Plaintiff's 'clearly es-

---

**6.** The issue of whether a constitutional right was clearly established is one of law for the court to determine. *Schwenkel v. Campo*, 1985 WL 1890, *3 (N.D.Ill. July 3, 1985).

tablished rights' in the fall of 1998" (Doc. 20 at 23), other courts have had no difficulty whatsoever concluding that the standards for a *Terry* stop have been fixed by the Supreme Court. *Fields v. City of Omaha*, 810 F.2d 830, 835 (8th Cir.1987) (at time of officer detained the plaintiff, "the Supreme Court had clearly established the necessary conditions for a police officer's investigative stop"; because the officer "lacked the reasonable suspicion necessary to initially stop and detain" the plaintiff, he could not claim qualified immunity "because he failed to follow clearly established constitutional law of which he should have known"); *Willowby v. City of Philadelphia*, 946 F.Supp. 369, 378 (E.D.Pa.1996) (officers who conducted patdown without reasonable suspicion plaintiffs were armed were not entitled to qualified immunity); *Signorile By and Through Signorile v. City of New York*, 887 F.Supp. 403, 412 (E.D.N.Y.1995) (rights under *Terry* and *Royer* clearly established); *Schwenkel, supra*, 1985 WL 1890, *3 ("a citizen's right to be free from an arrest without reasonable grounds or a *Terry* stop without reasonable suspicion was likewise clearly established" and "there was no basis for applying the immunity granted by *Harlow*"). Thus, defendants are simply incorrect when they contend that the right under *Terry* and *Royer* to be detained only where an officer has reasonable suspicion that a crime has been or is about to be committed is not clearly established.

The fact that such right was clearly established answers only the first part of the *Harlow* inquiry. Even if, as here, the officers had no basis for a lawful *Terry* stop, they remain entitled to qualified immunity if they can show, on the basis of an objective assessment of the circumstances, that an officer could reasonably have believed that there was lawful cause to detain the plaintiff. *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir.1988); *Harbin v. City of Alexandria*, 712 F.Supp. 67, 73 (E.D.Va. 1989), *aff'd*, 908 F.2d 967 (4th Cir.1990).

As stated in *Signorile By and Through Signorile v. City of New York*, 887 F.Supp. 403, 412 (E.D.N.Y.1995):

> an officer would be entitled to qualified immunity as a matter of law with respect to a situation where . . . reasonable suspicion [was] needed if the undisputed facts and all permissible inferences favorable to the plaintiff show either that (a) it was objectively reasonable for the officer to believe that . . . reasonable suspicion existed, . . ., or (b) officers of reasonable competence could disagree on whether exigent circumstances, probable cause or reasonable suspicion, respectively, were present.

*See also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991); *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir. 1986) (Scalia, J., sitting by designation).

Applying this standard, I conclude that the facts known to and observed by Officers Mitchell and Knallay would not have caused a reasonable officer, who was familiar with what an officer should know about the law under *Terry* and *Royer*, to have concluded that the plaintiff had engaged, or was about to engage in a crime. I also conclude that this issue is not one as to which reasonable officers, knowledgeable about their duties under the Fourth Amendment and *Terry* and *Royer*, could reasonably disagree.

The circumstances in this case are similar to those in *Fields v. City of Omaha*, 810 F.2d 830, 835 (8th Cir.1987), in which the court concluded that no cause had justified a stop and detention of a plaintiff who had been walking with a companion down a street at 10:30 p.m. "Walking in the middle of a street, even at night," the court stated, "is not a crime, nor does it lead a reasonable person to conclude that criminal behavior will soon occur." *Id.*

Sitting on a fire hydrant in the noonday sun is even less indicative of criminal conduct or propensity than walking down a street during the nighttime hours. Like

the officer in *Fields*, Officers Mitchell and Knallay can point to "nothing about plaintiff's conduct [that] could be described as either 'loitering' or 'prowling' as these words are commonly defined." *Id.* Accordingly, these officers, also like the officer in that case, cannot claim qualified immunity "because [they] failed to follow clearly established constitutional law of which they should have known."

### 2. Due Process

■■ Plaintiff claims that Officers Miller and Knallay violated his right to substantive due process when he was detained and arrested. As defendants point out, the Sixth Circuit held in *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1013 (6th Cir. 1999), that a substantive due process claim cannot be based on a Fourth Amendment violation. Because the plaintiff's claim arises specifically and clearly under the Fourth Amendment, he cannot maintain an overlapping substantive due process claim. Defendants are, accordingly, entitled to summary judgment as to plaintiff's due process claim.

### 3. Equal Protection

■ Plaintiff's claim under the Equal Protection Clause is not specific. Plaintiff appears, as defendants contend, to be asserting a claim of unlawful selective enforcement of the law against the plaintiff because of his race. To prevail on such claim, the plaintiff must show that the challenged law enforcement activity had both a discriminatory effect and a discriminatory intent. *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

■ To establish discriminatory intent a plaintiff must show that the officer's actions were motivated by racial animus; to establish discriminatory effect, the claimant must demonstrate that similarly situated individuals of a different race were not treated in a similar manner. *Id.*; *see also United States v. Jones*, 159 F.3d 969, 977 (6th Cir.1998) (defendant showed racial animus and presented some evidence of discriminatory effect by showing eight whites had not been referred for federal prosecution on cocaine charges).

■ There has been a failure of proof as to both of the *Armstrong* elements. Plaintiff has presented no evidence of racial animus on the part of Officers Miller and Knallay. In addition, he has not shown that Caucasians have not been detained or arrested for refusal to answer an officer's questions, where those questions were being asked without reasonable suspicion of criminal activity. *Cf. Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir.1997) ("it is an absolute requirement that the plaintiff make at least a prima facie showing that similarly situated persons outside her category were not prosecuted"; plaintiff met that burden by showing that officers arrested her, and did not arrest another drunk driving suspect, due to plaintiff's sexual orientation); *United States v. Ali*, 113 F.3d 1236, 1997 WL 219345, *2 (6th Cir.Apr 30, 1997) (unreported) ("Because defendant failed to overcome the presumption of regularity by clear and convincing evidence and provided no evidence that similarly situated Caucasians were not prosecuted, his selective prosecution claim must fail."); *United States v. Spanish Cove Sanitation, Inc.*, 91 F.3d 145, 1996 WL 366313, *2 (6th Cir. 1996) (unreported) ("A prima facie case of selective prosecution requires a showing that (1) others who engaged in the same conduct were not prosecuted, and (2) the government singled out the defendant for prosecution based upon 'such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights.' ").

Plaintiff does not appear to assert an equal protection claim against the individual officers, though the defendants' motion for summary judgment appears to assume that such claim has been plead. In any event, as with the plaintiff's general complaint about selective enforcement, there has been a complete failure of proof with

regard to any contention that the individual officers acted as they did toward the plaintiff because of his race.[7]

Plaintiff has not cited, and independent research has not found, a case upholding a complaint that, like the complaint in this case, failed to be supported by evidence of comparably situated Caucasians. Defendants are entitled to summary judgment as to plaintiff's claim that they violated his right to equal protection of the laws.

## B. State Claims

Plaintiff asserts three state claims against the defendants: common law assault, false arrest, and malicious prosecution. The defendants contend that they are immune under the provisions of O.R.C. § 2744.03(A)(6), which provides immunity to governmental employees unless:

(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Liability is expressly imposed upon the employee by a section of the Revised Code. Liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

At issue in this case is whether the acts of the individual officers were done "with malicious purpose, in bad faith, or in a wanton or reckless manner." [8]

The terms used in the immunity statute were recently defined in *Caruso v. State*, —— Ohio App.3d ——, ——, 2000 WL 186800 at *6 (Ohio App. 10 Dist., Feb. 17, 2000) (citations omitted):

Malicious purpose encompasses exercising "malice," which can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified.

Bad faith has been defined as the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another. Bad faith is not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

Finally, reckless conduct refers to an act done with knowledge or reason to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm and that such risk is greater than that necessary to make the conduct negligent. The term "reckless" is often used interchangeably with the word "wanton" and has also been held to be a perverse disregard of a known risk. As to all of the above terms, their definitions connote a mental state of greater culpability than simple carelessness or negligence.

In *Caruso* the employee became angry with his secretary, who had interrupted his

---

7. Other courts have rejected claims of discriminatory enforcement involving Fourth Amendment rights by individual officers based, as is the equal protection claim in this case, on a conclusory assertion of unequal protection. *United States v. Bullock*, 94 F.3d 896, 898 (4th Cir.1996) (defendant failed to lay foundation for his claim of unequal enforcement re. traffic stops); *1120 Central Condominiums Owners Ass'n v. City of Seal Beach*, 59 F.3d 174, 1995 WL 370330, *3 n. 2

(9th Cir. Jun 21, 1995) (unreported); *Clarke v. City of New York*, 1999 WL 608857, at *12 (E.D. N.Y. July 22, 1999).

8. The issue of whether defendants are entitled to immunity is a question of law. *Nease v. Medical College Hosp.*, 64 Ohio St.3d 396, 400, 596 N.E.2d 432 (1992) (citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992))

work. He approached her after asking if she had ever felt angry enough to slap someone. He did not touch her. The court held that he was entitled to immunity:

> Here, the issue of whether [defendant] was entitled to immunity requires an examination of the motives behind the alleged assault. . . . [I]f the alleged assault was simply to gratify his own personal feelings of animosity and resentment, he would not be entitled to immunity. But if the alleged assault were in some, albeit, misguided way, for the purpose of facilitating the business for which the [defendant] was engaged, he would not be manifestly outside the scope of his employment.

> Here, other than the outburst itself, there is no evidence in the record from which the trial court could conclude that [defendant] acted to gratify personal resentment. . . . As such, there was a lack of evidence in the record that [defendant] acted manifestly outside the scope of his employment or with malice.

> Moreover, the evidence does not support the trial court's finding that [defendant's] conduct was reckless. As discussed above, the standard for showing reckless or wanton misconduct is high. Mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor. Such perversity must be under such conditions that the actor must be conscious that his conduct will, in all probability, result in injury. . . .

> The evidence was such that, although the outburst may have been intended, there was a lack of evidence that [defendant's] conduct would, in all probability, result in injury. As such, there was a lack of evidence in the record that [defendant] acted recklessly.

*Id.* (citations omitted); *see also* Lutz v. Hocking Technical College, 1999 WL 355187, *6 (Ohio App. 4 Dist. May 18, 1999) (defining statute's terms in context of false arrest and excessive force claim);

### 1. Assault

An assault is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Smith v. John Deere Co.,* 83 Ohio App.3d 398, 406, 614 N.E.2d 1148 (1993). An assault is the beginning of an act which, if consummated, would constitute battery. The act must also be such as to cause reasonable fear of immediate physical violence. *Matlock v. Ohio Dept. of Liquor Control,* 77 Ohio Misc.2d 13, 665 N.E.2d 771, (Ohio Ct.Cl.1996) (citing *Ryan v. Conover,* 59 Ohio App. 361, 18 N.E.2d 277 (1938)).

Defendants contend that they cannot be held liable for having committed an assault where they used reasonable force to detain a suspect. That contention presupposes that they were acting lawfully when they sought to keep the plaintiff from walking away. That presupposition is incorrect, because Officers Miller and Knallay were acting without lawful justification. Accordingly, they had no right to undertake to touch the plaintiff. They can thus be deemed to have committed an assault on him. *Cf. Love v. City of Port Clinton,* 37 Ohio St.3d 98, 99, 524 N.E.2d 166 (1988) (officer who subdued and handcuffed the plaintiff committed intentional acts which, unless privileged, constituted a battery).

In this case, there is evidence in the record from which a jury could find that the officers were acting "to gratify personal resentment," and thus acting maliciously. Officer Miller acknowledged her frustration with the plaintiff's refusal to answer further questions and his attempt to walk away. I conclude that summary judgment should be denied as to plaintiff's assault claim.

### 2. False Arrest

In Ohio, the elements of false imprisonment and false arrest are the same, and the only difference between the two

torts is that false arrest involves a law enforcement officer, while false imprisonment involves a private citizen. *Rogers v. Barbera*, 170 Ohio St. 241, 243, 164 N.E.2d 162 (1960) ("[F]alse arrest and false imprisonment as causes of action are indistinguishable. The only distinction lies in the manner in which they arise.").

False imprisonment/false arrest is " 'to confine one intentionally without lawful privilege and against his consent within a limited area for any appreciable time, however short.' ". *Feliciano v. Kreiger*, 50 Ohio St.2d 69, 71, 362 N.E.2d 646 (1977) (citing 1 Harper and James, The Law of Torts, 226, Section 3.7 (1956)); *Faulkner v. Faulkner*, 2000 WL 5910, *1 (Ohio App. 6 Dist., Jan 07, 2000) ("The requisite elements for false arrest are (1) a detention of the person, and (2) an unlawful detention. The key to an inquiry into the legality of an arrest and detention is the validity of the arrest. . . . .").

Malice is not an element of, and good faith is not a defense to, a claim of a false imprisonment/arrest. *Brinkman v. Drolesbaugh*, 97 Ohio St. 171, 119 N.E. 451 (1918) (syllabus) ("False imprisonment per se is not concerned with good or bad faith, malicious motive or want of probable cause on the part of the prosecuting witness, or the officer causing the imprisonment.").

Officers Miller and Knallay had no just cause to arrest the plaintiff. Applying the standard enunciated in *Caruso, supra*, a jury could concluded that the decision to arrest plaintiff as he was attempting to exercise his constitutional right to walk away from further questioning was undertaken "to gratify personal resentment" on the officers' part. Their motion for summary judgment shall, accordingly, be denied.

### 3. Malicious Prosecution

The elements of the tort of malicious prosecution are: 1) malice in instituting or continuing a criminal prosecution, 2) lack of probable cause, and 3)

termination of the prosecution in favor of the accused. *Trussell v. General Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732 (1990) (syllabus). As stated in *Mayes v. Columbus*, 105 Ohio App.3d 728, 736, 664 N.E.2d 1340 (1995) (citing *Melanowski v. Judy*, 102 Ohio St. 153, 131 N.E. 360 (1921) (syllabus)), "the absence of probable cause is the gist of an action for malicious prosecution, and malice may be inferred from the absence of probable cause."

The court in *Mayes* also stated that:

For purposes of a claim of malicious prosecution, a criminal prosecution was undertaken without probable cause if the defendants instituted or continued the prosecution without a "reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused [was] guilty of the offense with which he [was] charged * * *."

105 Ohio App.3d at 737, 664 N.E.2d 1340 (citing *McFinley v. Bethesda Oak Hosp.*, 79 Ohio App.3d, 613, 617, 607 N.E.2d 936 (1992)).

Malice, the court stated in *Mayes*, is " 'an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice.' " *Id.* (citing *Criss v. Springfield Twp.*, 56 Ohio St.3d 82, 85, 564 N.E.2d 440 (1990)). To determine "whether a criminal prosecution was instituted or continued for an improper purpose, inquiry must be made into the basis for the decision to prosecute. In the absence of evidence showing a basis for the decision, it will appear to have been made without any basis, i.e., maliciously." *Id.*

Because the arrest was unlawful, plaintiff could not properly be prosecuted for resisting arrest. *Garfield Heights v. Simpson*, 82 Ohio App.3d 286, 290, 611 N.E.2d 892 (1992). Likewise, charging and prosecuting plaintiff for obstructing official business was improper, because "one cannot be found guilty . . . unless he

'hampers or impedes a public official in the performance of his lawful duties.'" *Hamilton v. Hamm*, 33 Ohio App.3d 175, 176, 514 N.E.2d 942 (1986). In this case, Officers Miller and Knallay were not engaged in the lawful performance of their duties when they arrested the plaintiff.

I conclude that there is sufficient evidence to enable a jury to find in favor of the plaintiff on his malicious prosecution claim. Chief Jornd sent a letter to the Toledo Municipal Prosecutor's Office encouraging continuation of the prosecution against the plaintiff. That letter stated that the insurance company that provided coverage to the Village desired continued prosecution of the plaintiff. The jury could infer on the basis of this letter that prosecution of the plaintiff was undertaken and maintained for an improper purpose (to avoid civil liability), rather than to bring a properly charged offender to justice.

In addition, Officer Miller acknowledged destroying her original report after being asked by Chief Jornd to prepare a revised version. While the defendants offer an explanation for that conduct, the jury could find that the failure to retain the original version reflected a desire to avoid injurious cross-examination or other adversity in the event of a civil suit. The jury could take such finding into consideration when assessing the bona fides of the prosecution.

## II. Claims Against the Village

Plaintiff claims that the Village has a practice, policy, and custom of unequal enforcement of the laws against African–Americans. In addition, the plaintiff has joined the Police Department as a defendant.

### 1. Equal Protection

Plaintiff claims that the Village has violated his right to equal protection due to a policy, pattern, and practice of unlawfully stopping, questioning, detaining, and harassing non-resident African–Americans

found present in or passing through the Village. In support of his contention, he offers evidence that: 1) the defendant Chief Jornd instructed a former dispatcher several years ago always to send a crew when there were African–Americans in the area; 2) a former police officer was likewise told several years ago to target minorities and keep them out of Ottawa Hills; 3) that former officer was told that another officer, who wanted to stop minorities, could stop whomever he wished regardless of whether there was a lawful basis for the stop; and 4) affidavits from individual motorists alleging that they were stopped and questioned without having committed any traffic offenses.

As argued by the defendants, plaintiff has not presented sufficient competent and probative evidence to overcome defendants' motion for summary judgment as to his claim of unequal protection by the Village. The former officer to whom reference was made left the Village Police Department in 1992, and the dispatcher who stated that crews were always sent when African–Americans were in the Village likewise left the department several years ago. Plaintiff's allegations do not suffice to show that there is a present practice and custom of unequal enforcement. The other allegations, which relate to three traffic stops in 1996 and 1997, are likewise insufficient to show that the plaintiff was affected by a current practice and custom of unequal application of the laws.

As plaintiff himself acknowledges, the statistical proof offered by the Village is inconclusive. Those statistics simply show the ethnicity of motorists stopped, warned, and cited. Those statistics do not indicate the relative numbers of persons of various ethnic backgrounds traveling on the Village's streets. Absent a baseline from which proportionate computations are possible, the statistics are without probative value. As with the plaintiff's equal protection claim against the individual officers, there has been a failure of proof with regard to such claim against the Village.

*See Chavez v. Illinois State Police,* 27 F.Supp.2d 1053, 1066 (N.D.Ill.1998) (absent a showing that similarly situated Caucasians were stopped at a less frequent rate, evidence of stops of African–Americans and Hispanic motorists was insufficient to show violation of equal protection).

To the extent that plaintiff is contending, in addition to his equal protection claim, that the Village has a custom and practice of stops and detentions on less than reasonable suspicion, his claim likewise fails in the face of defendants' summary judgment motion for want of proof.

### 2. Claims Against the Police Department

█ Defendants are correct in their contention that the Police Department, as a subunit of Village government, is not a proper party. *Williams v. Dayton Police Dep't,* 680 F.Supp. 1075, 1080 (S.D.Ohio 1987). Plaintiff also has sued the officers in their official capacity. A claim against a governmental employee is actually a claim against the governmental entity. Such claim is, thus, subsumed in the claim against the Village, and cannot be maintained independently. As the Supreme Court has stated, "official capacity suits generally represent only another way of pleading an action against an entity of which the officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

### Plaintiff's Motion for Partial Summary Judgment

█ Plaintiff moves for summary judgment on the basis that the unlawfulness of his seizure and arrest were litigated in his favor when the charges against him were dismissed in the Toledo Municipal Court. Plaintiff's motion is not well taken, because that dismissal cannot be used "offensively" by the plaintiff against Officers Miller and Knallay. *O'Kelly v. Russell Twp. Bd. of Trustees,* 675 F.Supp. 389, 391 (N.D.Ohio 1987) (ruling in plaintiff's favor in criminal proceeding did not have preclusive effect in his subsequent suit against an officer).

In any event, plaintiff's motion is, in practical effect, moot. I have determined that his seizure and arrest were not lawful, and that the officers are not entitled to qualified immunity. My decision overruling his instant motion is without prejudice to plaintiff's right to file a renewed motion for summary judgment based on my ruling against the defendants on their motion for summary judgment.

### Conclusion

In light of the foregoing, it is

ORDERED THAT;

1. Defendants' motion for summary judgment be, and the same hereby is granted with regard to plaintiff's due process and equal protection claims, joinder of the Ottawa Hills Police Department as a party defendant, and claims against the individual defendants in their official capacity, and is otherwise denied; and

2. Plaintiff's motion for summary judgment be, and the same hereby is denied, without prejudice to plaintiff's right to file a renewed motion for summary judgment.

So ordered.